C, 007 0 5  7. :11:57

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ASHTABULA RIVER COOPERATION GROUP II, an unincorporated association The Tower at Erieview 1301 E. Ninth Street. Suite 3500 Cleveland, OH 44114-1821, | : | CASE NO.:  **1 :07CV3 3  1** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | JUDGE: |
| Plaintiff, | : | **JUDGE GAUGHAN** |
| | : | |
| | : | **MAG. JUDGE VECCHIARELLI** |
| -vs- | : | |
| | : | |
| CONRAIL. INC. 2001 Market Street Philadelphia, PA 19103. | : | **COMPLAINT** |
| | : | |
| | : | |
| -and- | : | |
| | : | |
| CONSOLIDATED RAIL CORPORATION 2001 Market Street Philadelphia. PA 19103, | : | |
| | : | |
| | : | |
| -and- | : | |
| | : | |
| AMERICAN PREMIER UNDERWRITERS, INC. Provident Tower 1 East 4th Street Cincinnati. OH 45202 | : | |
| | : | |
| | : | |
| | : | |
| -and- | : | |
| | : | |
| PENNSYLVANIA LINES LLC Three Commercial Place Norfolk. VA 23510-9241, | : | |
| | : | |

517357-1

```
        -and-                               :
                                            :
NORFOLK SOUTHERN CORPORATION                :
Three Commercial Place                      :
Norfolk, VA 23510-2191,                     :
                                            :
        -and-                               :
                                            :
NORFOLK SOUTHERN RAILWAY                    :
COMPANY                                     :
Three Commercial Place                      :
Norfolk, VA 23510-2191.                     :
                                            :
        -and-                               :
                                            :
CSX CORPORATION                             :
500 Water Street, 15th Floor                :
Jacksonville. FL 32202,                     :
                                            :
        -and-                               :
                                            :
CSX TRANSPORTATION, INC.                    :
500 Water Street, 15th Floor                :
Jacksonville, FL 32202.                     :
                                            :
              Defendants.                   :
```

## Overview of the Claims

1.      Plaintiff, the Ashtabula River Cooperation Group II. brings this Complaint

to recover costs that is has paid and will pay for investigation. design, construction,

dredging, remediation and disposal activities related to contaminated sediment in the

Ashtabula River and Harbor ("**Ashtabula River Project**" or "**Project**"), which

contamination resulted from the releases of one or more Hazardous Substances as defined

by Section 101(14) of the Comprehensive Environmental Response, Compensation, and

Liability Act, as amended. ("**CERCLA**"), 42 U.S.C. § 9601(14) and other Pollution of the waters of the state, as defined by Ohio Revised Code §§ 6111.01(A) and (H), in violation of the statutes and common law of the State of Ohio by the defendants.

2.      Plaintiff also seeks a declaratory judgment that it is entitled to cost recovery for future response costs that it will or may incur and any and all related damages caused by or resulting from releases of Hazardous Substances and other Pollution of the waters of the state by the defendants to the area of the Ashtabula River from U.S. Army Corps of Engineers Station 195 to the mouth of the Ashtabula River in the City of Ashtabula. Ohio (the "**Ashtabula Site**").

<b><u>The Plaintiff</u></b>

3.      Plaintiff, the Ashtabula River Cooperation Group II (the "**ARCG II**" or "**plaintiff**"), is an unincorporated association of 14 companies organized to accomplish the environmental remediation of the Ashtabula Site in cooperation with the United States Environmental Protection Agency ("**USEPA**"), the Ohio Environmental Protection Agency ("**OEPA**"), the United States Army Corps of Engineers ("**USACE**") and various local governmental agencies.

4.      The ARCG II is comprised of the following individual member companies:  Cabot Corporation. CBS Operations Inc., Detrex Corporation. Elkem Metals Company, Inc., First Energy Corporation, GenCorp, Inc., Mallinckrodt, LLC, Millennium Inorganic Chemicals, Inc., Occidental Chemical Corporation, Ohio Power Company. Olin

3

Corporation, RMI Titanium Company, Inc.. The Sherwin-Williams Company and Union Carbide Corporation. The ARCG II and its members are "Persons" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

5.      As an unincorporated association, the ARCG II is the real party in interest and has standing to bring these claims for an on behalf of its members pursuant to Rule 17(A). Federal Rules of Civil Procedure and ORC § 1745.01 because each individual member of the ARCG II has standing to sue the defendants, the interests advanced in this Complaint are directly related to the objectives of the ARCG II and neither the claim asserted nor the relief demanded requires the personal participation of each member company of the ARCGII.

6.      The ARCG II has and will suffer injury because it has paid the entire non-governmental share of the investigation and clean up costs for the Ashtabula Site, while defendants have paid nothing since October 2003 – when defendants dissociated themselves from the predecessor group of companies – despite repeated demands that they do so by the ARCG II.

## The Defendants and Their Corporate Relationships

7.      Defendant Consolidated Rail Corporation ("**CRC**"). a Pennsylvania corporation, was incorporated on February 10, 1976 for the purpose of acquiring properties and assets of various railroads in the northeastern section of the United States

pursuant to the Regional Rail Reorganization Act of 1973, including railroad lines, facilities, real property and other assets adjacent and related to the Ashtabula Site.

8.      On July 1, 1993, Defendant Conrail, Inc. ("**Conrail**"), a Pennsylvania corporation and railroad holding company, became the owner of CRC pursuant to the Conrail Privatization Act of 1986.  As a wholly-owned subsidiary of Conrail, CRC was Conrail's primary asset.  Unless specifically indicated to the contrary, Conrail and CRC are collectively referred to herein as "Conrail."  Conrail is responsible for environmental liabilities caused by or resulting from railroad operations conducted by itself and others from at least 1976 on property, lines, assets and facilities adjacent or related to the Ashtabula Site, including the West, East, 5 1/2 Slip and Marina Parcels as hereinafter defined.

9.      Defendant American Premier Underwriters, Inc. ("**APU**"), a Pennsylvania corporation, formerly known as The Penn Central Corporation ("PCC"), the reorganized Penn Central Transportation Company, Debtor ("PCTC"), is the successor in interest to and/or the entity otherwise responsible for the environmental liabilities caused by or resulting from the railroad operations prior to approximately April, 1976 conducted by PCTC, PCC, the New York Central Railroad Company ("New York Central"), Penn Central Company, and the Pittsburgh, Youngstown & Ashtabula Railway Company ("PYARC") on property, lines, assets and facilities adjacent or related to the Ashtabula Site, including the West, East, 5 1/2 Slip and Marina Parcels as hereinafter defined.

10.     Defendant Pennsylvania Lines, LLC ("**Penn Lines**"), a Delaware company, was formed in 1999.  Penn Lines was merged into Norfolk Southern Railway Company in 2004.

11.     Defendant Norfolk Southern Corporation, a Virginia corporation incorporated in July 1980, together with its subsidiary and principal operating company. Defendant Norfolk Southern Railway Company, and their wholly-owned subsidiaries are collectively referred to as "**NS.**"  NS is the successor in interest to and/or the entity otherwise responsible for the environmental liabilities caused by or resulting from its railroad operations and the railroad operations of at least Penn Lines and Conrail on property, lines, assets and facilities adjacent or related to the Ashtabula Site, including the West, East, 5 1/2 Slip and Marina Parcels as hereinafter defined.

12.     Defendant CSX Corporation, a Virginia corporation incorporated in November 1980, together with its subsidiary and principal operating company. Defendant CSX Transportation, Inc., and their wholly-owned subsidiaries are collectively referred to as "**CSX.**"  CSX is the successor in interest to and/or the entity otherwise responsible for the environmental liabilities caused by or resulting from its railroad operations and the railroad operations of at least Conrail on property, lines, assets and facilities adjacent or related to the Ashtabula Site, including the West, East, 5 1/2 Slip and Marina Parcels as hereinafter defined.

13.     Beginning in 1996, CSX and NS were engaged in a takeover battle for control of Conrail. Ultimately, a compromise was reached wherein CSX and NS agreed to acquire Conrail jointly.

14.     On or about July 1998, the Surface Transportation Board of the United States Department of Transportation approved a transaction whereby CSX and NS acquired control of Conrail (the "**Transaction**") and divided various of its lines and assets between CSX and NS for their exclusive use (the **Penn Lines Assets** and **CSX Assets**, respectively), with certain Conrail lines and assets designated for joint use by CSX and NS (the "**Shared Assets**").

15.     To effect the division of Conrail's lines and assets as required by the Transaction, CRC formed two wholly-owned subsidiaries: New York Central Lines LLC and Penn Lines. NS was given the exclusive authority to appoint the officers and directors of Penn Lines. CRC was also obligated to follow the direction of NS with respect to the management and operation of the Penn Lines Assets. Penn Lines assumed all liabilities related to the Penn Lines Assets, including environmental liabilities, caused by or related to railroad operations adjacent and related to the Ashtabula Site.

16.     As a result of the Transaction and from on or about June 1999, NS became the beneficial owner and operator of the facilities, railroad lines and assets assigned to Penn Lines. NS and CSX were then responsible for all of the liabilities, including

7

environmental liabilities, attributable to the allocated assets which they were each operating as well as the Shared Assets.

17.     NS has operated and controlled CRC's facilities, lines and assets adjacent and related to the Site and which are relevant to the allegations in this Complaint.  CSX has also used and operated those lines, assets and facilities to the full extent permitted under the contractual 42% limitation on its use of the total ground storage, throughput and tonnage capacity in this area of operation.

18.     After the closing of the Transaction, CRC and Conrail retained responsibility for all liabilities related to the facilities, properties, operating lines and assets that arose prior to the division and transfer required by the Transaction and for the Shared Assets.  CRC continued to own the Shared Assets for the joint and exclusive benefit of NS and CSX, with costs of operation allocated between them on the basis of usage.

19.     Through a corporate reorganization in August 2004 between NS, CSX and Conrail, NS and CSX established direct ownership of Conrail and its primary subsidiary CRC, resulting in NS having a 58% economic and 50% voting interest in the jointly owned entity, with CSX receiving the remaining interests.

## Jurisdiction and Venue

20.     This Action arises under Section 107 of CERCLA, 42 U.S.C. § 9607 and the statutes and common law of the State of Ohio.  This Court has original and

supplemental jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1331 and 1367. and 42 U.S.C. §§ 9613(b) and 9613(g)(2).

21.     Venue properly lies in this District Court pursuant to 28 U.S.C. § 1391(b) and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b). because the releases of Hazardous Substances, Hazardous Waste and other Pollution of Waters of the State, together with the resulting damages occurred in this judicial district. because the substantial part of the events giving rise to claim occurred in this judicial district, and the property which is the subject of the action is located in this district.

### Defendants' Operations and Ownership of
### Property Adjacent and Related to the Ashtabula Site

22.     By a deed dated March 30, 1976 and recorded on December 13. 1978 in the Ashtabula County Recorders Office in Volume 5 at page 635, PCTC, Debtor, transferred approximately 55 acres of property adjacent to the east bank of the Ashtabula River and bounded on the north by Lake Erie in the City of Ashtabula, Ohio to Conrail, subject to various exceptions, easements and reservations (hereinafter the "**East Parcel**"). Prior to this transfer. PCTC and its predecessor in interest, New York Central. had owned and/or conducted railroad operations on the East Parcel since at least 1920.

23.     On or about December 5, 1986, Conrail transferred the East Parcel to Pinney Dock and Transport Company, now known as Pinney Dock & Transport LLC.

24.     By a deed dated March 31, 1976 and recorded on December 13. 1978 in the Ashtabula County Recorders Office in Volume 5 at page 662. PYARC, Debtor,

transferred multiple tracts of property adjacent to the west bank of the Ashtabula River and bounded on the south by the 5th Street Bridge and on the north by Lake Erie in the City of Ashtabula, Ohio to Conrail, subject to various exceptions, easements and reservations (hereinafter those tracts will be collectively referred to as the "**West Parcel**"). Prior to this transfer, PYARC had owned and/or conducted railroad operations on the West Parcel since at least 1902.

25.     On or about February 29, 2000, Conrail filed a deed transferring, to Penn Lines, all of its interest in the road bed, tracks, depot, yards, parking areas, culverts, bridges, tunnels, fixtures and other appurtenances on the portion of the West Parcel from approximately Walnut Boulevard north to Lake Erie, including all sidings and spur tracks contiguous to and connected to the subject property. On or about January 26, 1994, Conrail filed a deed transferring the remaining portion of the West Parcel from approximately Walnut Boulevard south to the 5th Street Bridge to another entity not engaged in railroad operations.

26.     By a deed dated March 30, 1976 and recorded on December 13, 1978 in the Ashtabula County Recorders Office in Volume 5, page 635, PCTC, Debtor, transferred approximately 5 or more acres of property adjacent to the east bank of the Ashtabula River and bounded on the north by State Route 531 (E. 6th Street) in the City of Ashtabula, Ohio to Conrail, subject to various exceptions, easements and restrictions (hereinafter the "**5 1/2 Slip Parcel**"). Prior to this transfer, PCTC and its predecessor in interest, New York Central, had owned and/or conducted railroad operations on the 5 1/2

Slip Parcel since at least 1918. and had allowed ship scrapping activities on the subject property since at least 1961.

27.     On or about February 29, 2000, Conrail transferred the 5 1/2 Slip Parcel to Penn Lines.

28.     By a deed dated December 2, 1881 and recorded on December 14, 1881 in the Ashtabula County Deed Records in Volume 102, page 283, PYARC and/or its predecessor in interest took title to multiple tracts of property adjacent to the west bank of the Ashtabula River and bounded on the north by the 5th Street Bridge and continuing south to at least Strongs Brook in the City of Ashtabula. Ohio (hereinafter the "**Marina Parcel**").

29.     By a conveyance instrument from the bankruptcy trustee for PYARC dated October 24, 1978 and recorded November 29. 1978 in the Ashtabula County General Records at Volume 4. page 9234, PCC and PYARC transferred the northern 3.51 acres of the Marina Parcel to an entity not engaged in railroad operations.  By a deed dated November 17. 1978 and recorded on November 30, 1978 in the Ashtabula County General Records at Volume 4, page 9459. PCC and PYARC transferred the remaining southern portion of the Marina Parcel to another entity not engaged in railroad operations.

### The Ashtabula Site History

30.     In July 1982, the Fields Brook in Ashtabula, Ohio, was investigated and assigned a Hazardous Ranking Score which qualified the Fields Brook as a Superfund

Site to be placed on the National Priorities List. Fields Brook was identified as "a tributary of the Ashtabula River which flows into Lake Erie." The Report accompanying the Hazardous Ranking Score also noted that the "Ashtabula River and Harbor contained contaminated sediments as well as Fields Brook."

31.     In July 1983, pursuant to the National Priorities Site Listing, USEPA determined that the Fields Brook Superfund Site included the Ashtabula River and Harbor. Then, in a document dated September 1983, entitled "Support Document for the National Priorities List," USEPA confirmed that contaminated water and sediment from the Ashtabula River and Harbor were used in the scoring of this site stating in that document that it had "defined the site as Fields Brook and adjacent industrial areas, the Ashtabula River, and the Harbor, because they are contiguous and the same Hazardous Substances are involved."

32.     On March 1, 1983, the Ohio Department of Health and the Ohio EPA issued a health advisory recommending that people not eat fish caught in the two-mile reach of the Ashtabula River from the Harbor area upstream to the 24th Street Bridge. The summary specifically noted that, based on samples collected in 1983 and 1984, among the pollutants detected were Polynuclear Aromatic Hydrocarbons ("**PAHs**"), and Polychlorinated Biphenyls ("**PCBs**") whose manufacture is now banned because of their potential cancer causing affects and persistence in the environment.

12

33.     In the July 1986 "Feasibility Study Summary", USEPA noted that, in 1982, the USACE had found PCBs in sediment samples from the Ashtabula River. Also, tissue analysis of fish caught in Fields Brook and the Ashtabula River had shown contamination by PCBs and other organic chemicals.

34.     As a direct result of the contamination found in the Ashtabula River and Harbor containing Hazardous Substances, the USACE was prohibited from dredging the sediment from the Ashtabula River and Harbor and open lake dumping that sediment in Lake Erie. The inability to dredge adversely affected the navigability of the waterway for recreational or commercial purposes.

**The 1989 Unilateral Administrative Order**

35.     In September 1989, USEPA Region 5 issued an Administrative Order by Consent (the "1989 UAO") directing investigative work regarding contamination in the Ashtabula River and Harbor to Detrex Corporation, Gulf + Western Inc., Occidental Chemical Corporation, and RMI Company, members of the ARCG II. The UAO required investigation work for the Ashtabula River and Harbor to include: evaluation of the nature and extent of the sediment, surface water, and fish contamination of the Ashtabula River and Harbor site, investigation of the potential sources of the contamination of the Ashtabula River and Harbor site, and an investigation of the impacts of the potential contamination on the water supply of the City of Ashtabula.

517357-1

36.    The 1989 UAO was issued pursuant to Sections 104(a) and 122(a) and
(d)(3) of CERCLA. The activities conducted were subject to approval by USEPA and
OEPA. and were required to be consistent with the National Contingency Plan. 40 C.F.R.
Part 300 and CERCLA.

37.    For the purposes of the 1989 UAO, the Ashtabula River Site was defined
as the Area extending from the 24th Street Bridge spanning the Ashtabula River to its
mouth at Lake Erie. The Ashtabula Site. as defined by the UAO, included the mouths of
tributaries to the Ashtabula River and any outfalls to the River segment.

38.    Pursuant to the Findings of Fact and Conclusions of Law in the 1989
UAO. the Ashtabula River Site was determined to be a "Facility" as defined in Section
101(9) of CERCLA and as defined in Section 3734.01(N) of the Ohio Revised Code; the
investigation of the surface water and sediment found that "Hazardous Substances" as
defined in Section 101(14) of CERCLA, "Industrial Wastes" as defined in Section
6111.01(C) of the Ohio Revised Code, and "Hazardous Waste" as defined in Section
3734.01(J) of the Ohio Revised Code had been deposited, stored, disposed of. placed,
discharged or located at the Facility: and that the past, present, and/or potential migration
of Hazardous Substances from the Site and the Hazardous Substances at the Site
constituted an actual or threatened "release" into the "environment" as those terms are
defined in Sections 101(22) and 202(8) of CERCLA and constituted a discharge of
"Pollution" and "Industrial Waste" into "Waters of the State" as those terms are defined

517357-1

in Ohio Revised Code Sections 6111.01(A), (C) and (H) and constitute a "Hazardous Waste" as that term is defined in Ohio Revised Code Section 3734.20.

39. Further, in the 1989 UAO, the determination was made that "the actions required by this Consent Order are in the public interest and are consistent with the National Contingency Plan, 400 C.F.R. Part 300."

40. Pursuant to the 1989 UAO, the companies conducted sampling and other activities and presented their findings in a draft written report. Comments to the draft Ashtabula River Investigation Report were provided by USEPA.

41. On May 27, 1993, USEPA held a public meeting for the Fields Brook Superfund Site to discuss the results of the sampling study and further work to be conducted at the Ashtabula River and Harbor. Specifically, USEPA proposed that sediment and transport modeling be done as part of future studies. In order to complete all of the requirements of the UAO issued in September 1989 for the Ashtabula River and Harbor, the final Ashtabula River Investigation Report (dated June 24, 1993) was completed and provided to USEPA.

42. Subsequently, on August 25, 1993, USEPA Region 5 sent a letter to potentially responsible parties at the Fields Brook Superfund Site notifying them that USEPA had decided to conduct a fund-led river study modeling sediment transport in the Ashtabula River pursuant to Section 104(a) of CERCLA.

15

43.     On January 12, 1994, the Ashtabula River RAP Advisory Council, including representatives of USEPA, met in Ashtabula. Ohio to discuss sediment clean-up in the Ashtabula River. At that meeting. USEPA indicated that it would proceed to address further work, including remediation of the Ashtabula River and Harbor. under CERCLA as a Superfund site.

44.     Brett Caull. representing U.S. Representative Eric Fingerhut, introduced a proposal at the January 12, 1994 meeting to clean-up the Ashtabula River and Harbor under the leadership of a private/public partnership involving participation of federal. state, and local governments, citizen groups, and industry.  USEPA indicated that it would be willing to participate as a member of the ARP to develop a remediation plan consistent with the National Contingency Plan for the Ashtabula River which would offer certain advantages, including the prospect of "mixed funding" for the Ashtabula Site.

## Formation of the Ashtabula River Partnership

45.     The Ashtabula River Partnership ("**ARP**") was organized pursuant to a charter signed in July 1994.  The Ashtabula River Partnership, comprised of 50 parties including USEPA. OEPA. USACE, private citizens, government officials, business leaders, local representatives, and industry. was formed for the purpose of effectively remediating the contaminated sediments in the Ashtabula Site.  With the support and participation of USEPA and OEPA, the Ashtabula River Partnership was charged with the responsibility of determining a comprehensive solution for remediation of the contaminated sediments in the Ashtabula River and Harbor.

46.     The responsible lead agency for the implementation of the remediation

developed by the Ashtabula River Partnership was USACE, Buffalo District Office.

USEPA Region 5, was designated as a cooperating agency, as was the OEPA.  The

tentatively identified local cooperator/ sponsor for the project was the Ashtabula City Port

Authority.  Members of industry, local government, local interest groups, and the general

public were all represented on the committees of the Ashtabula River Partnership, which

met monthly in Ashtabula, Ohio, to review the on-going work of the ARP.  The USEPA,

OEPA, and USACE sent representatives to the monthly ARP meetings held in Ashtabula,

Ohio.

47.     By letter dated September 15, 1997, David Ullrich, Acting Regional

Administrator for USEPA Region 5, to Rick Brewer and Fred Leitert, Ashtabula River

Coordinating Committee Co-Chairs, communicated USEPA's position and endorsement

of the Ashtabula River project stating:

> The U.S. EPA considers the Partnership process for addressing the
> contamination as the best vehicle for undertaking 'remediation otherwise
> scheduled' as defined under CERCLA.  In the course of the four years of
> the Partnership's work on the contaminated sediments situation, the U.S.
> EPA has participated in the work and monitored progress to be sure that the
> Partnership was meeting remediation milestones and generating work
> products that are not inconsistent with the National Contingency Plan
> (NCP), 40 CFR Part 300 *et seq.*

48.     The ARP adhered to the requirement established by Administrator Ullrich

as a condition for the remediation and dredging of the Ashtabula Site to be handled as a

"remediation otherwise scheduled" under Section 113 of CERCLA, and the ARP met the

17

remediation milestones and generated work products pursuant to the requirements of the NCP. The work of the ARP was subject to development and review by various committees. including an Outreach Committee which was responsible for developing and implementing external communications and strategies in a program for public involvement with the process. The Outreach Committee coordinated a public involvement program which included numerous public workshops/meetings and/or news conferences and correspondence to communicate with the public on project status/progress, conducted surveys and educational outreach sessions, and coordinated formal draft and final report review procedures.

49.     A Critical Path Method work plan was also developed for the project in accordance with federal planning and National Environmental Policy Act (NEPA) guidelines. The ARP Coordinating Committee met monthly. An annual meeting open to everyone occurred in August each year. The ARP kept and distributed minutes of the meetings. The USEPA. OEPA, and members of the ARP, and general public were provided with opportunities to review and comment on the documents prepared by the ARP and participate in connection with all milestones in the development of the CMP.

## The Comprehensive Management Plan

50.      The significant milestones leading to the development of the

Comprehensive Management Plan ("CMP") by USACE with the Ashtabula River

Partnership can be summarized, in part, as follows:

### 1994

| | |
|---|---|
| January | Partnership Concept Proposed |
| July | Partnership Formed/Charter Signed |
| August | Initial Organizational Meeting |

### 1995

| | |
|---|---|
| March | Approval of Bylaws |
| June | Project Supplemental Scoping Letters |
| June | Five Potential CDF (Confined Disposal Facility) Sites Announced |
| June | Initial Work on the Preliminary Draft Comprehensive Management Plan (CMP) and Environmental Impact Statement (EIS) and Appendices |
| July | Coordinator Hired |
| August | Speakers Bureau Formed |
| December | Three Potential CDF Sites Announced |

### 1996

| | |
|---|---|
| January | Notice of Intent to Prepare an Environmental Impact Statement. |
| | Project Studies Work |

December      Ashtabula River Foundation Formed

## 1997

February      Preferred CDF Upland Site Selected

May           First Preliminary Draft Comprehensive
              Management Plan (CMP) and Environmental
              Impact Statement (EIS) and Appendices distributed
              to the Partnership

September     Preliminary Draft Comprehensive Management
              Plan (CMP) and Environmental Impact Statement
              (EIS) and Appendices to the Partnership

December      U.S. Army Corps of Engineers Review Conference

December      Section 312(b) Authority Project Sub-Committee
              Formed and Work Initiated

## 1998

May           Preliminary Draft 312(b) Authority Report to the
              Partnership

May           Project Authority Conference at U.S. Army Corps
              of Engineers at Cincinnati, Ohio

October       Revised Preliminary Draft Comprehensive
              Management Plan (CMP) and Environmental
              Impact Statement (EIS) and Appendices to the
              Partnership

## 1999

              Revisions to Draft Comprehensive Management
              Plan (CMP) and Environmental Impact Statement
              (EIS) and Appendices (including Preliminary
              Wetland Mitigation Plans)

| July | Revised Draft Comprehensive Management Plan (CMP) and Environmental Impact Statement (EIS) and Appendices to the Partnership |
| September | Draft Comprehensive Management Plan (CMP) and Environmental Impact Statement (EIS) and Appendices to the Public and Subsequent Public Meeting |

**2000**

| — | Advance Preliminary Design and Value Engineering Review |
| July | Assessment/Evaluation of the State Road (Brownfield) Site as a Disposal Site |
| — | Supplemental Radionuclide Sampling and Analyses |
| — | Respond to Comments on the draft Reports and Revise Reports |

**2001**

| January | Preliminary Final Comprehensive Management Plan (CMP) and Environmental Impact Statement (EIS) and Appendices to Independent Technical Review and to the Partnership |
| — | Final Comprehensive Management Plan (CMP) and Environmental Impact Statement (EIS) and Appendices to the Public |
| — | Response to Comments and Record of Decision (ROD) to the Public |

51.     The CMP was submitted for approval to the USACE Lands and Rivers Division and Headquarters on August 3, 2004. The CMP was then submitted to the

517357-1

Assistant Secretary of the Army, John Paul Woodley, on September 8, 2004, and approved by him shortly thereafter. Secretary Woodley then transmitted the CMP to the Office of Management and Budget on September 22, 2004, for determination of its consistency with Administration budget priorities.

52.     Relative to the Final CMP/EIS and the Revised 401 Application, (dewatering facility discharges), the following were additional milestone dates:

> July 9, 2004 – Revised 401 Application made
>
> September 21, 2004 – OEPA initiated review
>
> October 15, 2004 – OEPA Public Notice – Notice of Receipt of 401 Application.
>
> December 9, 2005 – OEPA 401 Public Hearing
>
> September 16, 2005 – A Signed Water Quality Certification

### The Great Lakes Legacy Act of 2002

53.     During this same time period, USEPA's Great Lakes National Program Office ("**GLNPO**") invited the submission of proposals by a deadline of March 30, 2004, for projects which had the objective of remediating designated Areas of Concern affecting the Great Lakes eco-system.

54.     This invitation to make submissions resulted from the fact that, pursuant to the Great Lakes Legacy Act of 2002, which was passed as an amendment to the Federal

Water Pollution Control Act, USEPA was authorized and funded to remediate contaminated sediments in Areas of Concern in the Great Lakes.

55.     Because GLLA now provided USEPA with a potential source of funding to carry out the CMP, the Non-Federal Sponsor for the Ashtabula Project, the Ashtabula City Port Authority, with the assistance of the ARCG II, submitted an application to GLNPO for the Ashtabula Project.

56.     The application submitted to GLNPO requested funding for the dredging. dewatering and disposal of contaminated sediments beginning at the confluence of Fields Brook and continuing down to the Fifth Street Bridge (the portion of the Ashtabula River **upstream or south** of the Fifth Street Bridge is referred to as the "**GLLA Project**"). The proposal contemplated that the USACE would retain its responsibility for dredging the area **downstream or north** of the Fifth Street Bridge to the outer harbor of the mouth of the Ashtabula River to Lake Erie under its Operation and Maintenance ("O&M") and § 312(a) dredging authority under the Water Resources Development Act of 1990, as amended, ("**WRDA**" and the "**WRDA Project**").

57.     In Fall 2004. GLNPO recommended authorization of the remediation project for the upstream portion of the Ashtabula River as submitted by the NFS, which utilized the remedy selected by the CMP.  Subsequently, in April 2005. Secretary Woodley reviewed the entire Project and agreed to support a Project format whereby the USACE would be required to dredge only the contaminated sediment downstream of the

Fifth Street Bridge in the Ashtabula River, following completion of the GLLA segment

upstream of the Fifth Street Bridge.  Secretary Woodley visited the USACE Buffalo

District Office to review the project on April 20, 2005, and made a personal visit to tour

the Ashtabula River and Harbor on Thursday, April 21, 2005.

    58.    The Record of Decision ("**ROD**") and Design was modified by USEPA to

reflect and support the new Project format.  Significant milestones were:

| | |
|---|---|
| November 2005 | Statement of Work for the Ashtabula River Remediation Project. Ashtabula, Ohio |
| 2005 | Draft Detailed Design Report |
| June/July 2006 | Permit Items for USEPA/GLLA Project (Dredging and Pipeline) |
| March 2006 | (Revised Scope) White Paper and Revised Draft Record of Decision (ROD) |
| September 2006 | (Revised Scope) Draft Detailed Design Report |
| November 2006 | Revised ROD (signed) |

    59.    Following the approval for the GLLA Project and the separation of the

Ashtabula Project into the GLLA and WRDA segments, negotiations were conducted

during the remainder of 2005 among USEPA, Ashtabula City Port Authority, the State of

Ohio. and the ARCG II for the agreements to implement the GLLA Project.  This process

culminated in the agreements for the Ashtabula Project upstream of the Fifth Street

Bridge under the shared funding provisions of the GLLA.  All necessary agreements were

ultimately signed and finalized in November and December 2005.  By these binding

agreements, plaintiff, the ARCG II agreed to perform work necessary for the GLLA

Project and fund the non-federal share to implement the selected CERCLA-like remedial

action. These five agreements included:

- *Project Agreement* between the United States Environmental Protection Agency and the Ashtabula City Port Authority, including the *Statement of Work for the Ashtabula River Remediation Project, Ashtabula, Ohio*;
- *Funding and Indemnification Agreement* between the Ashtabula City Port Authority and the Members of the Ashtabula River Cooperation Group II with resolutions of approval by the Ashtabula City Port Authority;
- *Contribution Agreement* between the Ohio Environmental Protection Agency and the Ashtabula City Port Authority;
- *Indemnification Agreement* Concerning Ashtabula River Project by and among the Ohio Environmental Protection Agency, the Ashtabula City Port Authority and the Members of the Ashtabula River Cooperation Group II; and
- *Tolling Agreement* – Agreement Concerning Timing of Potential Natural Resource Damage Claims Relating to the Ashtabula River and Ashtabula Harbor.

60. The GLLA Project commenced during 2006 with the construction of the

landfill necessary to confine the dredged contaminated sediment. The dredging

commenced in the Fall of 2006, and the dredging of the upstream portion of the

Ashtabula Project under GLLA was completed in October 2007.

61. The ARCG II has provided the non-federal funding necessary to

implement the GLLA Project along with the State of Ohio, which has contributed $7

million.

## The WRDA Project

62.     USACE has committed to proceed with the completion of the WRDA Project to dredge the contaminated sediment downstream of the Fifth Street Bridge. The funds necessary for the federal share of the WRDA Project have been appropriated by Congress. The WRDA Project is currently under bid for contracting by contractors selected by the USACE. It is anticipated that the WRDA Project downstream of the Fifth Street Bridge will be commenced by the Spring of 2008 for completion in 2008.

63.     While the WRDA Project has not yet been commenced, it is anticipated that the ARCG II, which has committed to provide necessary funding on behalf of the non-federal sponsor, will pay at least 20% of the costs of the disposal of the contaminated sediment from this segment of the Ashtabula River and Harbor. The remainder of the dredging, transport, and disposal of the contaminated sediment will be funded by the federal share as provided in WRDA.

## The Ashtabula Project Contaminants of Concern and Objectives

64.     The CMP is a feasibility level planning document for the remediation of contaminated sediments in the Lower Ashtabula River and Harbor. The CMP was developed and approved by USACE with the ARP in a coordinated effort among its partners, including USEPA and OEPA. The Lower Ashtabula River was defined as the two-mile stretch extending from the upper limit of the Federal navigation channel to the mouth of the River. The CMP set forth a Recommended Environmental Dredging Plan

26

that would address contaminated sediment removal and disposal as well as measures to accomplish ecosystem restoration.

65.    The CMP determined that the primary contaminants of concern in the Lower Ashtabula River include numerous chlorinated organic compounds. especially PCBs and PAHs, heavy metals such as cadmium, mercury, lead, and zinc, and other organics such as hexachlorobenzene and hexachlorobutadiene.  Coal releases and runoff from coal piles are a source of PAHs and metals to the Ashtabula River.

66.    The CMP emphasized that PCB contamination in the river sediments was of concern because PCBs bioaccumulate and may cause a number of harmful effects. which potentially include both health and ecological effects.  The CMP stated that the many consequences of these accumulated PCBs include restrictions on fish consumption. reduced commercial shipping and recreational boating. habitat loss, and impacts on biota.

67.    The CMP identified the beneficial use impairments resulting from the release of hazardous substances, primarily PCBs and PAHs, as follows:

- Restriction on fish and wildlife consumption:
- Degradation of fish and wildlife populations;
- Fish tumors and other deformities:
- Degradation of benthos;
- Restrictions on dredging activities: and
- Loss of fish and wildlife habitat.

517357-1

68.     The CMP made a finding that the six impairments of beneficial uses identified in the CMP as being associated with the Ashtabula River AOC were directly related to contaminated sediment, more specifically to PCBs and PAHs in the contaminated sediment. Removal and remediation of these Hazardous Substances was determined in the CMP to be critical to the comprehensive restoration of the ecological integrity of the Site. The Ashtabula Project was designed and implemented in conformance with this objective.

<h3 style="text-align:center"><b>Defendants' Conduct Related to the Release of Hazardous<br>Substances and Causing of Pollution to the Ashtabula River</b></h3>

69.     The CMP further found in the area of the Ashtabula River downstream of the 5th Street Bridge to the mouth of the River and adjacent to the property owned by defendants or their predecessors in interest that. ". . . sediment contamination consists of primarily PAHs: which are likely associated with the coal dock developments in the area but also contaminated sediments migrating in from upstream."

70.     At times relevant to the allegations of this Complaint. each defendant has either owned and/or operated coal storage and handling facilities on property adjacent or otherwise related to the Ashtabula Site, including the West, East and Marina Parcels, or each defendant has assumed or is otherwise responsible for the liabilities of another entity related to or arising from the coal handling facilities (collectively, the **"coal handling facilities"**). These facilities and operations include:  unloading. assembly and storage yards for rail cars hauling coal; a cross river coal conveyor system; an overland coal

conveyor system; and ship loading and unloading facilities on the Ashtabula River with associated coal storage silos.

71. At times relevant to the allegations of this Complaint, each defendant has owned, operated and/or conducted railroad operations on property adjacent or otherwise related to the Ashtabula Site, including the West, East, 5 1/2 Slip and Marina Parcels, or each defendant has assumed or is otherwise responsible for the liabilities of another entity related to or arising from the railroad facilities (collectively, the "**railroad facilities**"). These facilities and operations include: the installation of railroad ties and bulkheading containing creosote; installation and maintenance of rail lines; an engine house for repair, maintenance and storage of railroad cars and equipment utilizing degreasing solvents; and other fueling facilities for railroad equipment.

72. Raw coal, creosote, diesel exhaust, waste fuel oil, combusted coal or coke, coal dust and degreasing solvents containing PAHs, Hazardous Substances, Hazardous Waste and other causes of Pollution are associated with and result from activities conducted by the defendants at the coal handling and railroad facilities, as well as the railroad operations of each of the defendants in the area adjacent or related to the Ashtabula Site. In addition, PAHs, Hazardous Substances, Hazardous Waste and other causes of Pollution are and have been present in the soil on the East, West, 5 1/2 Slip and Marina Parcels at all times relevant to the allegations of this Complaint as to each defendant.

29

73.     PAHs, Hazardous Substances. Hazardous Waste and other causes of
Pollution, including coal dust, are and have been discharged or released to the Ashtabula
Site from the East, West, 5 1/2 Slip and Marina Parcels as a result of railroad activities
conducted by the defendants, including activities at the coal handling and railroad
facilities, through means of surface erosion/runoff, storm sewer and culvert discharges.
air emissions, disposal, and direct spills during defendants' operations.

74.     In June, 1973, PCTC was subject to a judgment resulting from an
enforcement action brought by the United States in the U.S. District Court for the
Northern District of Ohio (Case No. 71-1067(Y)) to prohibit or restrict the deposit of coal
particulate air emissions on property of the U.S. Coast Guard station located at the
Ashtabula River and Harbor caused by or resulting from PCTC's operation and
ownership of all or a portion of the coal handling facilities.

75.     In January, 1986, Conrail entered into a Consent Order as a result of an
enforcement action brought by the United States in the U.S. District Court for the
Northern District of Ohio (Case No. 82-2767) for violations of the Clean Air and Clean
Water Acts requiring Conrail to enclose the cross-river coal conveyance system and to
institute other systems to control coal dust and particulate emissions caused by or
resulting from Conrail's ownership and operation of the coal handling facilities.  Coal
discharges from Conrail's coal conveyor and coal storage piles into the Ashtabula River
and Lake Erie were found to constitute discrete conveyances of pollutants into waters of
the United States.  Conrail also paid a civil penalty in the amount of $75.000.

76.     From 1976 to the present, there has been numerous. unauthorized releases of PAHs, Hazardous Substances, Hazardous Waste and other causes of Pollution, including coal dust, into the Ashtabula River from the East, West, 5 1/2 Slip and Marina Parcels as a result of railroad operations conducted thereon by Conrail, including the following:

a) The release of 100 gallons of waste diesel oil affecting a one mile area of the Ashtabula River in July 1979. resulting in the issuance of a Notice of Violation to Conrail by the OEPA;

b) Two Notice of Violations issued to Conrail in June 1980 and January 1982 by OEPA for the release of pollutant particulate matter into the air over the Ashtabula River from the coal handling facilities:

c) The release of waste diesel fuel to the Ashtabula River resulting from a train wreck in September, 1981;

d) The release of 700 to 800 gallons of waste diesel fuel resulting in oil slicks on the Ashtabula River caused by oil separator malfunctions in December, 1980 and June. 1984 at the railroad facilities:

e) The release of 1.000 gallons of waste diesel fuel into a storm sewer emptying into the Ashtabula River in August. 1987 from the railroad facilities:

517357-1

f) The release of waste diesel fuel through a culvert at the railroad facilities into the Ashtabula River in June, 1988: and

g) The release of 2.500 gallons of diesel fuel resulting from a pierced rail tank 100 yards from the Ashtabula River in October, 1994.

77.     From February 1990 through at least May 1994. Conrail routinely exceeded its Clean Water Act discharge ("**NPDES**") permit limits for the discharge of PAHs to the Ashtabula River. In addition, Conrail did not fulfill its sampling and reporting requirement under the NPDES permit and it unlawfully discharged coal and wastewater from the cross river conveyance system resulting in a $150,000 fine for numerous violations of the Clean Water and the Oil Pollution Acts at the coal handling facilities.

78.     On May 1, 1961, New York Central, as owner and the predecessor to PCTC. leased to Acme Scrap Iron and Metal Company ("**Acme Scrap**") approximately 2.0 acres of property located within the 5 1/2 Slip Parcel to be used as a dump and dry dock to perform ship scrapping and other activities, which lease was subsequently extended by the successors of New York Central into the mid-1970s (the "**Acme Scrap Lease**"). The Lease provided for construction of drainage culverts "to assure unimpeded drainage into said River."

32

79.     After becoming the owner of the property subject to the Acme Scrap Lease in 1976. Conrail extended the Lease and consented to a sublease to Triad Salvage. Inc. ("**Triad**").

80.     As a result of the dumping and ship scrapping activities conducted on and adjacent to the 5 1/2 Slip Parcel by Acme Scrap and Triad since at least 1961. a "working dump" and other disposal locations were established there containing heavy metals. buried debris, 55 gallon drums of waste chemicals, fuel tanks, oil-filled electrical circuit breakers. and capacitors containing PCBs. all of which were sources of Hazardous Substances, Hazardous Waste and causes of Pollution released to the Ashtabula Site.

81.     Ship scrapping and disposal operations conducted on or near the 5 1/2 Slip Parcel by Acme Scrap and Triad have caused releases of Hazardous Substances, Hazardous Waste and Pollution to the Ashtabula Site through surface erosion/runoff. direct discharge and air emissions.

82.     The operations conducted by Triad Salvage and Acme Scrap on the 5 1/2 Slip Parcel caused the United States to commence an enforcement action in the U.S. District Court for the Northern District of Ohio (Case No. C'88-1300) for violations of the Clean Air Act due to the emission of asbestos. a hazardous air pollutant. from ship scrapping, resulting in a cease and desist order and a $25.000 penalty under a Partial Consent Decree in 1992.

83.     In addition, several hundred corroded electrical capacitors stored on the 5
1/2 Slip Parcel leaked and caused further releases of PCBs into the Ashtabula Site,
resulting in the filing of an Emergency Response Notification and Incident Report by
Conrail in April 1991.

## Consistency with the National Contingency Plan

84.     CERCLA authorizes private party plaintiffs to recover from liable parties
all necessary response costs consistent with the NCP.

85.     For the purpose of cost recovery under Section 107(a)(4)(B) of CERCLA,
a cleanup is consistent with the 1990 NCP if, taken as a whole, it is in substantial
compliance with 40 C.F.R. § 300.700(c)(5)-(6) and results in a CERCLA-quality cleanup.

86.     The CMP for the Ashtabula River and Harbor was developed through a
public process, with the joint efforts and comment of the USACE, USEPA, OEPA, and
members of the ARP as well as the general public.  As a result, the CMP provided an
opportunity for meaningful public participation during its entire development, including
the process of evaluating and selecting a remedy.

87.     The CMP was developed through a thorough, fully documented
investigation which carefully delineated the nature and extent of contamination and,
based upon the data and objectives of the response action, the remedy was selected
among an array of potential remedial alternatives subjected to review and comment by
USEPA and OEPA.  The remedial action selected by the CMP, and ultimately approved

by USEPA and USACE, is protective of human health and the environment, and also
restores the beneficial uses of the Ashtabula River and Harbor through its nature
resources.

88.    The CMP has been determined to be cost-effective utilizing permanent and
resource recovery technologies.  USEPA implemented the CMP remedy as the basis for
the GLLA-funded project upstream of the 5th Street and the USACE plans to implement
the CMP remedy for the WRDA Project for the area downstream of the 5th Street Bridge
to the mouth of the Ashtabula River.

89.    The remedial action selected from the CMP for both the GLLA and
WRDA portions of the Ashtabula Project met all the legally applicable or otherwise
relevant and appropriate federal or stricter State of Ohio requirements.  In fact, all of the
standards, controls, substantive requirements, or criteria for the facility setting and all
aspects of the remedial action, were specifically satisfied, and none was waived or
violated.

90.    All of the work, costs, and expenses for the development of the CMP and
the implementation of the GLLA and WRDA Projects constituted necessary costs of
response consistent with and in substantial compliance with the NCP and its
requirements.  The dredging, transport, dewatering disposal, and remediation of the
contaminated sediments for the Ashtabula Project have resulted and will result in a
CERCLA-quality clean-up.

## CLAIMS FOR RELIEF

## COUNT I
## Cause of Action Under CERLCA §107(a)

91.     The allegations in paragraphs 1 through 90 above are incorporated by reference as a basis for this cause of action.

92.     Plaintiff and defendants are "persons" within the meaning of Section 101(21) of CERCLA. 42 U.S.C. § 9601(21).

93.     Defendants are persons liable under Section 107(a) of CERCLA, 42 U.S.C. §9607(a). on the basis of the facts alleged in this Complaint which establish that they were the Owners and/or Operators [as defined at Section 101(20) of CERCLA, 42 U.S.C. § 9601(20)] at the time of a Release [as defined at Section 101(22) of CERCLA, 42 U.S.C. § 9601(22)] of Hazardous Substances [as defined at Section 101(14) of CERCLA, 42 U.S.C. § 9601(14)] from a Facility [as defined at Section 101(9) of CERCLA, 42 U.S.C. § 9601(9)] to the Ashtabula Site which has resulted in the necessary incurrence of Response Costs [as defined at Sections 101(23) and (24) of CERCLA, 42 U.S.C. §§ 9601(23 and (24)] in a manner consistent with the National Contingency Plan. 40 C.F.R. Part 300.

94.     Under the GLLA, the costs for the Ashtabula Project upstream or south of the 5th Street Bridge are funded and shared on the basis of 50% federal/50% non-federal allocation. In determining this allocation. USEPA assigned to the plaintiff a share

approximating the full liability of the non-federal share for the GLLA funded portion of the Ashtabula Project.

95.     The clean up costs for the GLLA Project segment of the Ashtabula River upstream or south of the 5th Street Bridge are estimated upon completion to be approximately $61,000,000. The non-federal share for the GLLA segment of the Project is $31,500,000, and with the State of Ohio having contributed $7,000,000 to the Ashtabula Project non-federal share, the ARCG II has or will pay at least $23,500.000 of Shared GLLA Project Costs. in addition to its own directly incurred Response Costs. The ARCG II is also responsible for certain GLLA Project cost overruns and long-term operation and maintenance costs.

96.     Payments by the ARCG II to fund the GLLA Project have been made by or through the Ashtabula City Port Authority. as the non-federal sponsor. The funds are managed and distributed under the oversight of USEPA for the dredging, transportation. treatment and disposal of contaminated sediment for the GLLA Project.

97.     The ARCG II has incurred costs of at least $1.9 million for support of the ARP, for development of the CMP, the negotiation and development of the Ashtabula Project, including the GLLA and WRDA Projects. and to implement the Ashtabula Project.

98.     All of the costs for the Ashtabula Project incurred or to be incurred by the ARCG II for the WRDA Project as described in paragraphs 94 through 97 of this

Complaint constitute necessary costs of response, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), are consistent with the National Contingency Plan, 40 C.F.R. Part 300, within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and are recoverable by plaintiff from the defendants under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

99.     The portion of the Ashtabula Project downstream or north of the 5th Street Bridge has been authorized under WRDA and its shared cost formula for Section 312(a) and Operation & Maintenance Dredging Projects. The federal share of the WRDA Project has been appropriated by Congress. The WRDA Project is expected to be completed by Fall 2008.

100.     It is anticipated that the ARCG II, on behalf of the non-federal sponsor, will pay at least $750,000 to fund the non-federal share of the WRDA Project, which is based on a 20% share of the costs of disposal of the contaminated sediment.

101.     The ARCG II will incur future operation and maintenance costs related to the landfill located in Ashtabula, Ohio, which was designed, permitted and built in compliance with the Toxic Substance Control Act ("TSCA"), and into which the contaminated sediments from the GLLA and WRDA Projects have been or will be placed. The ARCG II also will incur future costs necessary to conduct monitoring and sampling required under the landfill permit, and to respond to any Project review.

102.    These costs for the Ashtabula Project incurred by the ARCG II as described in paragraphs 94 through 101 of this Complaint constitute necessary costs of response. as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), are consistent with the National Contingency Plan, 40 C.F.R. Part 300, within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and are recoverable by plaintiff from the defendants under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

103.    NS, acting for itself and the other defendants except APU, disassociated from the ARCG in October 2003. causing the formation of the ARCG II shortly thereafter.  Since that time. NS has refused to pay any share of the costs of the Ashtabula Project. has not participated in any way in the Ashtabula Project, and has not performed any work.  Neither NS nor the other defendants have contributed any funding for the investigation. development, negotiation, or remediation of the Ashtabula Project since October 2003.

104.    Defendants are jointly and severally liable under CERCLA to pay the costs and expenses for the Ashtabula Project described in this Complaint.

105.    The ARCG II is entitled to recovery against defendants for all costs. including attorneys fees, and/or defendants' equitable share of all costs that the ARCG II has incurred and will in the future incur as necessary costs of response consistent with the National Contingency Plan for the Ashtabula Project and the Ashtabula Site.

## COUNT II
### Common Law Public Nuisance

106.    The allegations in paragraphs 1 through 105 above are incorporated by reference as a basis for this cause of action.

107.    Defendants owed a common law duty to the general public, including plaintiff, the ARCG II, not to create a nuisance in the Ashtabula River and Harbor which would interfere with its use, impair its natural resources, impair its beneficial enjoyment and the exercise of related legal rights common to the public, impair the navigability of the waterway, and/or prevent the ability to conduct dredging of the ship channel in the Ashtabula River for navigation or other purposes.

108.    As a direct and proximate result of the various intentional and negligent acts and omissions of defendants described in the Complaint, including the release of Hazardous Substances, Hazardous Waste and the causing of Pollution to the Ashtabula River and Harbor, defendants have caused and created a public nuisance which has contaminated the Ashtabula River and Harbor, which has interfered with its reasonable use by the general public, which has prevented its beneficial enjoyment and the exercise of legal rights common to the public, which has impaired its natural resources, and which has prevented USACE from conducting dredging to ensure navigation through the ship channel and for other purposes authorized by WRDA.  Such acts, omissions and uses have resulted from the treatment, storage, disposal and/or release of Pollution, contaminants, Hazardous Substances, Hazardous Waste, Industrial Wastes, and/or Other

517357-1

Wastes into the waters of the Ashtabula River and Harbor in an unreasonable and unlawful manner, and without consent, authority, or legal right by the defendants.

109.    Defendants knew, or had reason to know, that the Release of Hazardous Substances, Hazardous Waste, Pollution, contaminants, Industrial Wastes, and/or Other Wastes into the waters of the Ashtabula River and Harbor would have a significant detrimental effect upon the Ashtabula River and Harbor, upon the rights of beneficial use and enjoyment common to the public, upon its natural resources, upon its navigability and use for recreational and commercial purposes.

110.    As a result of discharge and/or release of Hazardous Substances, Hazardous Waste, Pollution, contaminants, Industrial Wastes, and/or Other Wastes into the waters of the Ashtabula River and Harbor from facilities owned and/or operated by defendants, plaintiff has incurred and continues to incur, the costs of dredging, transporting, remediating and disposal of contaminated sediment.

111.    Defendants' conduct and their continuing failure to remove the Hazardous Substances, Hazardous Waste, Pollution, contaminants, Industrial Wastes, and/or Other Wastes from the Ashtabula River and Harbor was and is unreasonable, negligent and/or reckless, and constitutes a nuisance and an unreasonable significant interference with the public use and enjoyment of the Ashtabula River and Harbor, its resources, and its navigation channel.

112. As a direct and proximate result of the public nuisance created by defendants, plaintiff is entitled to compensatory damages, reimbursement, and indemnification for its costs and expenses in the amount to be determined at trial, plus its attorneys fees, expenses and costs.

## COUNT III

### Public Nuisance Arising From Violation Of Ohio Revised Code Chapter 6111

113. The allegations in paragraphs 1 through 112 above are incorporated by reference as a basis for this cause of action.

114. The terms "Pollution," "Sludge," "Sludge Materials," "Sewage," "Industrial Waste," "Other Wastes," and "Waters of the State" as used in this Complaint have the same meaning as defined in Ohio Revised Code Section 6111.01.

115. Ohio Revised Code Section 6111.04(A)(1) prohibits any person from causing Pollution or from placing or causing to be placed any Sewage, Sludge or Sludge Materials, Industrial Waste or Other Wastes, including coal dust, in a location where they cause Pollution to any Waters of the State. The Ashtabula River and Harbor are Waters of the State of Ohio.

116. Ohio Revised Code Section 6111.04(A)(2) is a legislative determination that the conduct prohibited under Section 6111.04(A)(1) constitutes an unreasonable interference with a public right and is a public nuisance.

117.    Ohio Revised Code Chapter 6111 was enacted for the purpose of imposing a duty upon persons to prohibit water pollution and protect the Waters of the State as well as to provide for public health, safety and welfare and to protect public rights from unreasonable interference.

118.    Defendants violated Ohio Revised Code Section 6111.04(A)(1) by causing Pollution and/or by placing or causing to be placed Sewage, Sludge or Sludge Materials, Industrial Waste and/or Other Wastes, including coal dust, in a location where they caused Pollution to the waters of the Ashtabula River and Harbor resutling in a public nuisance.

119.    As a direct and proximate result of defendants' actions in violation of Ohio Revised Code Section 6111.04(A)(1), plaintiff has suffered an injury that was not suffered by other members of the public insofar as plaintiff has incurred and continues to incur the costs of dredging, transporting, remediating, disposing and removing contaminated sediment from the Ashtabula River and Harbor.

120.    Defendants' actions in violation of Ohio Revised Code Section 6111.04 constitute a public nuisance for which plaintiff is entitled to recover from defendants all damages, costs, and expenses suffered by plaintiff as a result of defendants' releases of Hazardous Substances, Pollution, contaminants, Industrial Wastes and/or Other Wastes, including coal dust, and actions causing Pollution to Waters of the State and as a result of

43

defendants' failure to pay anything for the dredging, transport, disposal and remediation of the contaminated sediment from the Ashtabula River and Harbor.

## COUNT IV

### Public Nuisance Arising From Violation Of Ohio Revised Code Section 3767.13

121.    The allegations in paragraphs 1 through 120 above are incorporated by reference as a basis for this cause of action.

122.    Ohio Revised Code Section 3767.13(C) prohibits any person from unlawfully obstructing or impeding the passage of a navigable river or harbor, or corrupting or rendering unwholesome or impure, a watercourse. stream. or water. or unlawfully diverting such watercourse from its natural course or state to the injury or prejudice of others.  The Ashtabula River and Harbor is a navigable river, harbor or water. within the meaning of Ohio Revised Code Section 3767.13(C).

123.    Ohio Revised Code Section 3767.13(C) is a legislative determination that the conduct prohibited under that section constitute an unreasonable interference with a public right and is a public nuisance.

124.    Ohio Revised Code Chapter 3767 was enacted for the purpose of imposing a duty upon persons to prohibit water pollution and protect waters of the State of Ohio as well as to provide for public health, safety and welfare and to protect public rights from unreasonable interference.

125. Defendants violated Ohio Revised Code Section 3767.13(C) by discharging and/or releasing Hazardous Substances, Hazardous Waste, Pollution, contaminants, Industrial Wastes and/or Other Wastes into the Ashtabula River and Harbor, thereby obstructing, impeding the passage of, corrupting or rendering unwholesome or impure the waters of the Ashtabula River and Harbor.

126. As a direct and proximate result of defendants' actions in violation of Ohio Revised Code Section 3767.13, plaintiff has suffered an injury that was not suffered by other members of the public insofar as plaintiff has incurred and continues to incur the costs of dredging, transporting, treating and disposing of contaminated sediment from the Ashtabula River and Harbor.

127. Defendants' actions in violation of Ohio Revised Code Section 3767.13 constitute a public nuisance for which plaintiff is entitled to recover from defendants all damages, costs, and expenses suffered by plaintiff as a result of defendants' releases of Hazardous Substances, Hazardous Waste, Pollution, contaminants, Industrial Wastes and/or Other Wastes to Waters of the State and as a result of defendants' failure to pay anything for the dredging, transport, treatment and disposal of the contaminated sediment from the Ashtabula River and Harbor.

## COUNT V
### Unjust Enrichment

128. The allegations in paragraphs 1 through 127 above are incorporated by reference as a basis for this cause of action.

129.     The activities of defendants including their use, handling, storage, disposal and/or release of Pollution, contaminants, Hazardous Substances, Hazardous Waste, Industrial Wastes and/or Other Wastes at and/or from the properties described in this Complaint into the Ashtabula River and Harbor have caused plaintiff to incur past costs and expenses, environmental liability, and future costs and expenses.  To the extent that plaintiff has paid and/or in the future will pay such costs and expenses, or may be required to pay for such environmental liabilities, restoration, or damage, plaintiff has discharged or will discharge the costs, expenses or liabilities of defendants.

130.     Therefore, because defendants received and retained, and continue to receive and retain, a benefit from the actions and payments of plaintiff for the costs and expenses associated with the aforementioned releases of Hazardous Substances, Pollution, contaminants, Hazardous Waste, Industrial Wastes and/or Other Wastes by defendants into the Ashtabula River and Harbor, without contributing or paying anything to or for the dredging or remediation of the Ashtabula River and Harbor, defendants have improperly benefited from plaintiff's actions, payments, and its undertaking to dredge and remediate contaminated sediment for the Ashtabula River and Harbor.

131.     The retention of these benefits by defendants would be unjust without payment to plaintiff for the benefit which defendants knowingly have received and continue to receive.  Defendants have not reimbursed plaintiff for the reasonable value of the benefit received despite requests from plaintiff to do so.  Thus, defendants have been, and will continue to be, unjustly enriched at the expense of plaintiff.

132.    Plaintiff is entitled to recover from defendants the amount by which defendants have been. and will continue to be, unjustly enriched. in an amount to be determined at trial.

**COUNT VI**

**Indemnity/Contribution**

133.    The allegations in paragraphs 1 through 132 above are incorporated by reference as a basis for this cause of action.

134.    The contamination in the Ashtabula River and Harbor, which will continue to be investigated. remediated and/or removed by plaintiff, has resulted from the activities of defendants described in this Complaint.  Plaintiff's liability, if any, for the conditions at the Site is secondary to that of defendants, and derives from its decision to enter into the agreements providing that plaintiff, the ARCG II. shall pay the non-federal share for the GLLA and WRDA Projects.

135.    Under Ohio law and general principles of equity. plaintiff is entitled to be indemnified by defendants for the full amount of costs it has incurred or will incur, in investigating. dredging. transporting. disposing and treating the sediment from the Ashtabula River and Harbor contaminated with Hazardous Substances, Hazardous Waste, Pollution, contaminants. Industrial Waste and/or Other Wastes.

136.    Alternately, should complete indemnification be unavailable to plaintiff for any reason, plaintiff is entitled under Ohio law and general principles of equity to contribution from defendants for their full and fair share of the costs incurred. or to be

incurred, by plaintiff in investigating. remediating and/or removing the Hazardous

Substances. Pollution. contaminants. Hazardous Waste, Industrial Wastes and/or Other

Wastes from the Ashtabula River and Harbor, and/or addressing the Hazardous

Substances or Pollution at and from the railroad and coal handling facilities.

WHEREFORE, Plaintiff, the ARCG II. demands judgment in its favor and against

each of the defendants as follows:

A.    Adjudging, decreeing, and declaring that, under Section 107(a) of
      CERCLA. 42 U.S.C. § 9607(a), defendants are jointly and severally liable
      to plaintiff. the ARCG II, for all costs of the remedial action and any other
      necessary costs of response incurred in connection with the Ashtabula
      Project, including the GLLA and WRDA Projects, as well as the costs
      incurred for administrative, transactional. and ARP support for the
      Ashtabula Project, and all other related costs, expenses, or work, together
      with interest thereon;

B.    Adjudging, decreeing. and declaring that defendants are jointly and
      severally liable to plaintiff. the ARCG II, for past and future costs incurred
      by plaintiff in connection with the dredging. transporting. treatment and
      disposal of contaminated sediment at or from the Ashtabula River and
      Harbor as a direct and proximate result of the public nuisance caused
      wholly. or in substantial part. by defendants, together with interest thereon;

C.    Adjudging, decreeing, and declaring that defendants have been unjustly enriched and are therefore jointly and severally liable to plaintiff, the ARCG II, in an amount to be determined at trial which represents the reasonable value of the benefit received and retained by defendants in connection with plaintiff's payment of past and future costs associated with the dredging, transporting, treatment and disposal of contaminated sediment at or from the Ashtabula River and Harbor caused by or resulting from the aforementioned releases by the defendants of Hazardous Substances and Pollution, together with interest thereon;

D.    Adjudging, decreeing, and declaring that under Ohio law and general principles of equity, plaintiff, the ARCG II, is entitled to either complete indemnification for the full amount of costs it has incurred or will incur, or alternatively, to contribution from defendants for their full and fair share of the costs incurred, or to be incurred, by plaintiff in investigating, dredging, treating and/or removing the contaminated sediment caused by or resulting from the release and discharge of Hazardous Substances and Pollution by defendants to the Ashtabula River and Harbor, together with interest thereon;

E.    Ordering defendants to pay plaintiff, the ARCG II, its costs of this action, including reasonable attorneys fees; and

F.    Granting plaintiff, the ARCG II, such other and further relief as the Court

may deem just and appropriate.


Respectfully submitted,


Joseph D. Lonardo (OH 0016135)
**Vorys, Sater, Seymour and Pease LLP**
1828 L Street NW, 11th Floor
Washington D.C. 20036-5109
Telephone:  202-467-8811
Facsimile:  202-533-9037
E-mail: jdlonardo@vssp.com


Ralph E. Cascarilla (OH 0013526)
**Walter & Haverfield LLP**
The Tower at Erieview
1301 E. Ninth Street, Suite 3500
Cleveland, OH  44114-1821
Telephone:  216-928-2908
Facsimile:  216-916-2346
E-mail:  rcascarilla@walterhav.com

**Attorneys for Plaintiff, Ashtabula
River Cooperation Group II**